UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
                                                            :
GIZMODO MEDIA GROUP, LLC,                                   :
                                                            :
                            Plaintiff,                      :
                                                            :        17 Civ. 3566 (DLC)
          -against-                                          :
                                                            :
DEPARTMENT OF JUSTICE,                                      :
                                                            :
                            Defendant.                      :
                                                            :
-----------------------------------------------------------------------x


**MEMORANDUM OF LAW OF DEFENDANT DEPARTMENT OF JUSTICE
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**


GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007
Telephone:  (212) 637-2769
Facsimile:  (212) 637-2786

*Attorney for Defendant
Department of Justice*


ANDREW E. KRAUSE
Assistant United States Attorney
– Of Counsel –

# TABLE OF CONTENTS

**PAGE**

PRELIMINARY STATEMENT ......................................................................................1

BACKGROUND .........................................................................................................3

    A.    The FOIA Request and the Department's Initial Glomar Response.......................3

    B.    DOJ's Modification of Its Glomar Response Based on
then-Director Comey's Congressional Testimony....................................................4

    C.    Subsequent Declassification Decisions and the July 20, 2018
Release to Plaintiff.................................................................................................5

    D.    The Remaining Issue in Dispute .........................................................................7

ARGUMENT ............................................................................................................7

    I.    Legal Standards for Summary Judgment in FOIA Actions ....................................7

        A.    The Freedom of Information Act...................................................................7

        B.    Special Considerations in National Security Cases ....................................8

        C.    The Glomar Response ...................................................................................9

    II.    DOJ Properly Refused to Confirm or Deny the Existence of
Other Responsive Records Pursuant to FOIA Exemption 1 ..................................10

    III.    DOJ Has Not Officially Acknowledged the Existence or
Non-Existence of Additional Responsive Records................................................16

        A.    Legal Standard for Official Acknowledgement.........................................16

        B.    There Has Been No Official Acknowledgement of the Existence
or Non-Existence of Additional Records Responsive to the
FOIA Request ............................................................................................19

CONCLUSION.......................................................................................................24

# TABLE OF AUTHORITIES

**CASES**                                                                      **PAGE**

*ACLU v. CIA,*
  710 F.3d 422 (D.C. Cir. 2013) ........................................................................ 18

*ACLU v. Dep't of Justice,*
  681 F.3d 61 (2d Cir. 2012)......................................................................... 9, 16

*ACLU v. U.S. Dep't of Def.,*
  628 F.3d 612 (D.C. Cir. 2011) ............................................................... 9, 17, 19

*Afshar v. Dep't of State,*
  702 F.2d 1125 (D.C. Cir. 1983) ....................................................................... 11

*Amnesty Int'l USA v. CIA,*
  728 F. Supp. 2d 479 (S.D.N.Y. 2010)............................................................... 17

*Associated Press v. U.S. Dep't of Justice,*
  549 F.3d 62 (2d Cir. 2008)................................................................................. 7

*Carney v. U.S. Dep't of Justice,*
  19 F.3d 807 (2d Cir. 1994)................................................................................. 8

*Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice,*
  331 F.3d 918 (D.C. Cir. 2003) ........................................................................... 9

*CIA v. Sims,*
  471 U.S. 159 (1985)........................................................................................... 7

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013).......................................................................................... 13

*Dep't of the Interior v. Klamath Water Users Protective Ass'n,*
  532 U.S. 1 (2001).............................................................................................. 7

*Doyle v. U.S. Dep't of Homeland Sec.,*
  No. 17 Civ. 2542 (KPF), 2018 U.S. Dist. LEXIS 125614 (S.D.N.Y. July 26, 2018)......... 8

*Ferguson v. FBI,*
  No. 89 Civ. 5071 (RPP), 1995 U.S. Dist. LEXIS 7472 (S.D.N.Y. June 1, 1995),
  *aff'd,* 83 F.3d 41 (2d Cir. 1996) ....................................................................... 8

*Fitzgibbon v. CIA,*
  911 F.2d 755 (D.C. Cir. 1990) .......................................................................... 22

*Frugone v. CIA*,
    169 F.3d 772 (D.C. Cir. 1999) ........................................................................ 9

*Gardels v. CIA*,
    689 F.2d 1100 (D.C. Cir. 1982) ..................................................................... 10

*Halperin v. CIA*,
    629 F.2d 144 (D.C. Cir. 1980) ........................................................................ 9

*Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*,
    891 F.2d 414 (2d Cir. 1989) .................................................................... 17, 18

*John Doe Agency v. John Doe Corp.*,
    493 U.S. 146 (1989) .................................................................................... 7, 8

*Larson v. Dep't of State*,
    565 F.3d 857 (D.C. Cir. 2009) ................................................................... 8, 10

*Long v. Office of Pers. Mgmt.*,
    692 F.3d 185 (2d Cir. 2012) ............................................................................ 8

*Marrera v. U.S. Dep't of Justice*,
    622 F. Supp. 51 (D.D.C. 1985) ...................................................................... 15

*N.Y. Times Co. v. CIA*,
    314 F. Supp. 3d 519 (S.D.N.Y. 2018),
    *appeal docketed*, No. 18-2112 (2d Cir. July 18, 2018) ...................... 16, 18, 21

*N.Y. Times Co. v. NSA*,
    205 F. Supp. 3d 374 (S.D.N.Y. 2016) ............................................................. 8

*N.Y. Times Co. v. U.S. Dep't of Justice*,
    756 F.3d 100 (2d Cir. 2014),
    *amended on denial of reh'g*, 758 F.3d 436 (2d Cir. 2014) ........... 11, 16, 17, 18

*N.Y. Times. Co. v. U.S. Dep't of Justice*,
    872 F. Supp. 2d 309 (S.D.N.Y. 2012) ............................................................. 8

*Phillippi v. CIA*,
    546 F.2d 1009 (D.C. Cir. 1976) ..................................................................... 10

*Platsky v. NSA*,
    No. 11 Civ. 4816 (SLT) (RLM), 2013 U.S. Dist. LEXIS 190947
    (E.D.N.Y. Jan. 30, 2013), *aff'd*, 547 F. App'x 81 (2d Cir. 2013) ................... 14

iii

*Pub. Citizen v. Dep't of State*,
   11 F.3d 198 (D.C. Cir. 1993) ........................................................................ 17

*Roman v. NSA,*
   No. 07 Civ. 4502 (JFB) (WDW), 2009 U.S. Dist. LEXIS 9147
   (E.D.N.Y. Feb. 9, 2009), *aff'd*, 354 F. App'x 591 (2d Cir. 2009) ................... 15

*Schwarz v. U.S. Dep't of Treasury*,
   131 F. Supp. 2d 142 (D.D.C. 2000),
   *aff'd*, No. 00-5453, 2001 U.S. App. LEXIS 13882 (D.C. Cir. May 10, 2001)................ 15

*Wilner v. NSA*,
   592 F.3d 60 (2d Cir. 2009) .................................................................... *passim*

*Wilson v. CIA*,
   586 F.3d 171 (2d Cir. 2009) .................................................................. *passim*

*Wolf v. CIA*,
   473 F.3d 370 (D.C. Cir. 2007) ...................................................... 9, 10, 16, 17

**STATUES**

5 U.S.C. § 552 ................................................................................ 1, 2, 8, 10

**MISCELLANEOUS**

Executive Order 13526
   75 Fed. Reg. 707 (Dec. 29, 2009) ........................................................ *passim*

H.R. Rep. No-89-1497 (1966) ..................................................................7

*Transcript of the House Permanent Select Committee on Intelligence Hearing on Russian Interference in the 2016 U.S. Election,*
   March 20, 2017 (*available at* https://www.washingtonpost.com/news/post-politics/wp/2017/03/20/full-transcript-fbi-director-james-comey-testifies-on-russian-interference-in-2016-election/?utm_term=.b9fl9a0cf9cf (last visited Sept. 13, 2018)........5

Defendant Department of Justice ("DOJ" or the "Department"), by its attorney, Geoffrey S. Berman, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Gizmodo Media Group, LLC ("Plaintiff") brought this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking to compel the Department to disclose records "provided to or received from the [Foreign Intelligence Surveillance Court ("FISC")] pertaining to requests made in 2016 for one or more warrants to conduct electronic surveillance on [then-candidate Donald Trump], any of his associates, any of his properties, and/or any foreign entities (including, but not limited to, SVB Bank and Alfa Bank) with whom he or his associates were alleged to be in communication." Compl. ¶ 12. In response, the Department has acknowledged, based upon the Congressional testimony of then-FBI Director James B. Comey, that it has no records of alleged wiretapping of then-candidate Trump in Trump Tower by the Obama Administration prior to the 2016 presidential election, as referenced in President Trump's Twitter post on March 4, 2017. In addition, following the President's declassification of a memorandum prepared by staff of the House Permanent Select Committee on Intelligence ("HPSCI"), and the subsequent release of a different memorandum prepared by certain HPSCI members, the Department has acknowledged responsive Foreign Intelligence Surveillance Act ("FISA") applications and orders to conduct surveillance of Carter Page, and produced redacted versions of those documents. With these two exceptions, DOJ has provided a "Glomar" response, declining to confirm or deny the existence of records for any other FISA surveillance subjects responsive to Plaintiff's FOIA request.

The only issue remaining in this case is the propriety of DOJ's Glomar response.  The accompanying declaration of Patrick N. Findlay, an original classification authority who is the Acting Chief and Special Counsel of the Office of Strategy Management and Development of DOJ's National Security Division ("NSD"), establishes that providing a substantive response to the remainder of Plaintiff's FOIA request would reveal classified information pertaining to intelligence sources and methods that is protected by Executive Order 13526 and FOIA Exemption 1, 5 U.S.C. § 552(b)(1).  NSD has determined that disclosure of the existence or non-existence of records for any other FISA surveillance subjects responsive to Plaintiff's FOIA request could reasonably be expected to cause harm to national security.  NSD's determination is entitled to substantial deference from this Court under well-settled law.

Contrary to the premise of Plaintiff's complaint, there has been no official acknowledgement of the existence or non-existence of FISA applications or orders as to a wide range of potential surveillance targets.  The two limited official acknowledgements relevant to Plaintiff's FOIA request—then-Director Comey's Congressional testimony regarding the non-existence of records of alleged wiretapping of then-candidate Trump in Trump Tower by the Obama Administration prior to the 2016 presidential election, and the extraordinary and unprecedented acknowledgement of the existence of FISA applications and orders to conduct surveillance of Carter Page—satisfied the exacting criteria for official disclosure of classified information responsive to Plaintiff's FOIA request, and DOJ modified its FOIA response accordingly.  But there have been no other official disclosures that specifically reveal the existence or non-existence of the particular alleged FISA subjects that Plaintiff seeks to discover.  Accordingly, DOJ's Glomar response as to the remaining portions of Plaintiff's request remains proper.

For these reasons, and as set forth in greater detail below, DOJ's motion for summary judgment should be granted.

## BACKGROUND

### A.     The FOIA Request and the Department's Initial Glomar Response

This matter arises from a FOIA request submitted by Plaintiff to NSD on April 6, 2017 ("Request"), in which Plaintiff seeks "all information provided to or received from the FISA Court pertaining to requests made in 2016 for one or more warrants to conduct electronic surveillance on Mr. Trump, any of his associates, any of his properties, and/or any foreign entities (including, but not limited to, SVB Bank and Alfa Bank) with whom he or his associates were alleged to be in communication."  *See* Declaration of Patrick N. Findlay, dated Sept. 13, 2018 ("Findlay Decl."), ¶ 3 & Ex. 1 ¶ 4.

By email dated April 14, 2017, NSD refused to confirm or deny the existence of responsive records pursuant to FOIA Exemption 1, explaining that it does not search for records in response to requests regarding the use or non-use of certain foreign intelligence gathering techniques in which the confirmation or denial of the existence of responsive records would, in and of itself, reveal information properly classified under Executive Order 13526.  *See* Findlay Decl. ¶ 3 & Ex. 1 ¶ 5.  That same day, Plaintiff appealed NSD's determination to DOJ's Office of Information Policy ("OIP"), which is responsible for adjudicating Department FOIA appeals; on April 18, 2017, OIP affirmed NSD's determination that the existence or non-existence of responsive records is a properly classified fact pursuant to FOIA Exemption 1.  *See id.*  Plaintiff filed this lawsuit on May 12, 2017.  *See* Dkt. No. 1.

**B.      DOJ's Modification of Its Glomar Response Based on
then-Director Comey's Congressional Testimony**

In the Request, Plaintiff asserted that certain public statements by President Trump made via Twitter on March 4, 2017 "disclosed . . . that he and/or his associates had been a target of electronic surveillance during the 2016 Presidential campaign." Compl. ¶ 12.  The Request claimed that President Trump's public comments "officially confirmed the previously published reports that a FISA warrant was applied for and denied in June 2016 and again applied for (more narrowly) and granted in October 2016," and "officially disclosed the existence and nature of those warrant applications and orders." Compl. ¶ 13.  Specifically, Plaintiff cited a four-part Twitter post on President Trump's Twitter account on March 4, 2017:

- "Terrible! Just found out that Obama had my 'wires tapped' in Trump Tower just before the victory.  Nothing found.  This is McCarthyism!"

- "Is it legal for a sitting President to be 'wire tapping' a race for president prior to an election?  Turned down by court earlier.  A NEW LOW!"

- "I'd bet a good lawyer could make a great case out of the fact that President Obama was tapping my phones in October, just prior to Election!"

- "How low has President Obama gone to tapp [*sic*] my phones during the very sacred election process.  This is Nixon/Watergate.  Bad (or sick) guy!"

*Available at* www.twitter.com/realDonaldTrump (last visited Sept. 13, 2018); *see* Compl. ¶ 9.[1]

During sworn testimony before the HPSCI on March 20, 2017, then-FBI Director Comey was asked about President Trump's March 4, 2017 tweets, and he responded:

---

[1] The complaint only includes three of the four parts of President Trump's four-part Twitter post from March 4, 2017; the fourth and final part of that post is provided here for complete context.

> With respect to the President's tweets about alleged wiretapping directed at him by the prior administration, I have no information that supports those tweets and we have looked carefully inside the FBI.  The Department of Justice has asked me to share with you that the answer is the same for the Department of Justice and all its components.  The Department has no information that supports those tweets.

*See* Transcript of the HPSCI Hearing on Russian Interference in the 2016 U.S. Election, March 20, 2017 (*available at* https://www.washingtonpost.com/news/post-politics/wp/2017/03/20/full-transcript-fbi-director-james-comey-testifies-on-russian-interference-in-2016-election/?utm_term=.b9fl9a0cf9cf (last visited Sept. 13, 2018)); Findlay Decl. ¶ 3 & Ex. 1 ¶ 6.

Based upon this testimony by then-Director Comey, DOJ modified its Glomar response to confirm that the Department—including NSD—has no records responsive to Plaintiff's request inasmuch as it seeks records of alleged wiretapping of then-candidate Trump in Trump Tower by the Obama Administration prior to the election, as referenced in the March 4, 2017 tweets.  *See* Findlay Decl. ¶ 4 & n.1.  However, DOJ maintained its Glomar response to the remainder of Plaintiff's FOIA request.[2]

### C.  Subsequent Declassification Decisions and the July 20, 2018 Release to Plaintiff

In February 2018, President Trump authorized the declassification of a memorandum, dated January 18, 2018, addressed to HPSCI Majority Members from HPSCI Majority Staff, entitled "Foreign Intelligence Surveillance Act Abuses at the Department of Justice and the Federal Bureau of Investigation" ("Majority Memo").  *See* Findlay Decl. ¶ 6; Dkt. Nos. 39-1 (Feb. 2, 2018 letter); Dkt. No. 39-2 (Majority Memo).  The Majority Memo discussed the fact

---

[2] Between September 27, 2017 and January 19, 2018, the parties filed cross-motions for summary judgment regarding the Glomar response.  *See* Dkt. Nos. 20-22, 30-34, 37.  After subsequent developments required changes to DOJ's response to the Request, *see* Section C, *infra*, those motions were terminated as moot by order of the Court on March 30, 2018, *see* Dkt. No. 44.

that DOJ and the FBI had sought and obtained authority pursuant to FISA to conduct surveillance of Carter Page.  Findlay Decl. ¶ 6.  Page is described in the Majority Memo as "a U.S. citizen who served as a volunteer advisor to the Trump presidential campaign."[3]  Dkt. No. 39-2 at 1.  As set forth in a February 2, 2018, letter from the Counsel to the President, the Majority Memo was declassified "in light of the significant public interest in the memorandum," and "reflects the judgments of its congressional authors."  Dkt. No. 39-1 at 2.  Approximately three weeks after the public disclosure of the Majority Memo, an unclassified, redacted version of a memorandum prepared by the "HPSCI Minority," dated January 29, 2018, addressed to All Members of the House of Representatives, and entitled "Correcting the Record – The Russia Investigation" ("Minority Memo"), was released; the Minority Memo also discussed applications to the FISC and orders from the FISC to conduct surveillance of Carter Page.  *See* Correcting the Record – The Russia Investigation, from the House Permanent Select Committee on Intelligence Minority, to All Members of the House of Representatives (Jan. 29, 2018), *available at* https://intelligence.house.gov/uploadedfiles/ hpsci_redacted_minority_memo.pdf (last visited Sept. 13, 2018).

Because the declassification of the Majority Memo and the subsequent release of the redacted Minority Memo both revealed the existence of FISA applications and orders to conduct surveillance of Carter Page, the Department reviewed the FISA applications and orders for potential release of segregable information in response to Plaintiff's FOIA request.  *See* Findlay Decl. ¶¶ 6-7.  In July 2018, upon completion of the review and processing of the Page

---

[3] Although Page was not associated with the Trump campaign when the initial FISA order was obtained, the Page FISA applications and orders were deemed to be responsive to that portion of Plaintiff's FOIA request that seeks "all information provided to or received from the FISA Court pertaining to requests made in 2016 for one or more warrants to conduct electronic surveillance on . . . any of [Mr. Trump's] associates . . . ."  *See* Compl. ¶ 12.

FISA applications and orders, DOJ released to Plaintiff in part, pursuant to the FOIA, 412 pages of FISA applications and orders to conduct surveillance of Page. *Id.* ¶ 7. NSD is no longer asserting a Glomar response with respect to the fact that Page was the subject of these FISA applications and orders. *Id.* ¶ 8. This FOIA release was unprecedented—prior to the release, there had never been any public disclosure of an application to the FISC or an order from the FISC pertaining to a specific individual surveillance target. *Id.* ¶ 7.

### D. The Remaining Issue in Dispute

Plaintiff is not contesting the withholdings in DOJ's July 2018 release of FISA applications and orders to conduct surveillance of Carter Page, and is not challenging the adequacy of DOJ's search for records responsive to its FOIA request. *See* Dkt. No. 52. Accordingly, the only issue remaining in dispute is Plaintiff's challenge to DOJ's Glomar response to the remainder of the FOIA request.

## ARGUMENT

## I. Legal Standards for Summary Judgment in FOIA Actions

### A. The Freedom of Information Act

FOIA represents a balance struck by Congress "'between the right of the public to know and the need of the government to keep information in confidence.'" *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting H.R. Rep. No. 89-1497, at 6 (1966)); *Associated Press v. U.S. Dep't of Justice*, 549 F.3d 62, 64 (2d Cir. 2008) (per curiam). Thus, while FOIA requires disclosure under certain circumstances, the statute recognizes "that public disclosure is not always in the public interest," *CIA v. Sims*, 471 U.S. 159, 166-67 (1985), and mandates that records need not be disclosed if "the documents fall within [the] enumerated exemptions." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7 (2001); *see John Doe*

*Agency*, 493 U.S. at 152 (FOIA exemptions are "intended to have meaningful reach and application").

Most FOIA actions are resolved through motions for summary judgment. *See, e.g.*, *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994); *N.Y. Times Co. v. NSA*, 205 F. Supp. 3d 374, 380 (S.D.N.Y. 2016). The defendant federal agency bears the burden of proving that the withheld information falls within the exemptions it invokes. *See* 5 U.S.C. § 552(a)(4)(B). Summary judgment is warranted on the basis of agency declarations when those submissions "'describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Wilner v. NSA*, 592 F.3d 60, 73 (2d Cir. 2009) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)). An agency's declaration in support of its determinations is "accorded a presumption of good faith." *Long v. Office of Pers. Mgmt.*, 692 F.3d 185, 191 (2d Cir. 2012) (quoting *Carney*, 19 F.3d at 812).[4]

## B. Special Considerations in National Security Cases

In addressing requests for release of classified information relating to national security, courts repeatedly have recognized "the uniquely executive purview of national security" and "the relative competencies of the executive and judiciary," and "have consistently deferred to

---

[4] DOJ has not submitted a Local Civil Rule 56.1 statement, as "the general rule in this Circuit is that in FOIA actions, agency affidavits alone will support a grant of summary judgment," and a Local Civil Rule 56.1 statement thus "would be meaningless." *Ferguson v. FBI*, No. 89 Civ. 5071 (RPP), 1995 U.S. Dist. LEXIS 7472, at *6 (S.D.N.Y. June 1, 1995), *aff'd*, 83 F.3d 41 (2d Cir. 1996); *N.Y. Times. Co. v. U.S. Dep't of Justice,* 872 F. Supp. 2d 309, 314 (S.D.N.Y. 2012) (noting that a Local Civil Rule 56.1 statement is not required in FOIA actions in this Circuit); *Doyle v. U.S. Dep't of Homeland Sec.*, No. 17 Civ. 2542 (KPF), 2018 U.S. Dist. LEXIS 125614, *25 n.11 (S.D.N.Y. July 26, 2018).

executive affidavits predicting harm to the national security." *Wilner*, 592 F.3d at 76 (internal

quotation marks omitted); *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007).  Courts must give

"substantial weight" to agencies' declarations regarding national security, and particularly their

predictive judgments regarding whether disclosure of particular information would harm national

security.  *See ACLU v. Dep't of Justice,* 681 F.3d 61, 69 (2d Cir. 2012); *Wilner*, 592 F.3d at 73.

In such matters, "the court is not to conduct a detailed inquiry to decide whether it agrees with

the agency's opinions; to do so would violate the principle of affording substantial weight to the

expert opinion of the agency."  *Halperin v. CIA*, 629 F.2d 144, 148 (D.C. Cir. 1980); *see also*

*ACLU*, 681 F.3d at 70-71 ("Recognizing the relative competencies of the executive and

judiciary, we believe that it is bad law and bad policy to second-guess the predictive judgments

made by the government's intelligence agencies regarding whether disclosure of the [withheld

information] would pose a threat to national security.") (quoting *Wilner*, 592 F.3d at 76) (internal

quotation marks omitted)); *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 927

(D.C. Cir. 2003) (courts have "consistently deferred to executive affidavits predicting harm to

the national security, and have found it unwise to undertake searching judicial review"); *Frugone*

*v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999) ("courts have little expertise in either international

diplomacy or counterintelligence operations").  Because assessment of harm to national security

is entrusted to the Executive Branch, "the government's burden is a light one," "searching

judicial review" is inappropriate, and "plausible" and "logical" government arguments for

nondisclosure should be sustained.  *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 624 (D.C. Cir.

2011); *see Wilner*, 592 F.3d at 73; *ACLU*, 681 F.3d at 69.

     **C.**    **The Glomar Response**

     It is well settled that "'an agency may refuse to confirm or deny the existence of records

where to answer the FOIA inquiry would cause harm cognizable under a FOIA exception.'"

*Wilner*, 592 F.3d at 68 (quoting *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982)) (brackets

omitted).  Indeed, a Glomar response "is the only way in which an agency may assert that a

particular FOIA statutory exemption covers the 'existence or nonexistence of the requested

records' in a case in which a plaintiff seeks such records." *Id.* (quoting *Phillippi v. CIA*, 546

F.2d 1009, 1012 (D.C. Cir. 1976)); *see Larson*, 565 F.3d at 861 (FOIA exemptions "cover not

only the content of protected government records but also the fact of their existence or

nonexistence, if that fact itself properly falls within the exemption").

　　　　When issuing a Glomar response to a FOIA request, the "agency must tether its refusal to

respond to one of the nine FOIA exemptions."  *Wilner*, 592 F.3d at 68 (internal quotation marks

and citation omitted).  "[W]hen the [a]gency's position is that it can neither confirm nor deny the

existence of the requested records, there are no relevant documents for the court to examine other

than the affidavits which explain the [a]gency's refusal."  *Wolf*, 473 F.3d at 374 n.4 (internal

quotation marks omitted).  An agency declaration in support of a Glomar response "should

'explain [] in as much detail as possible the basis for [the agency's] claim that it can be required

neither to confirm nor to deny the existence of the requested records.'"  *Wilner*, 592 F.3d at 68

(quoting *Phillippi*, 546 F.2d at 1013).

## II.　　DOJ Properly Refused to Confirm or Deny the Existence of Other Responsive Records Pursuant to FOIA Exemption 1

　　　　DOJ's Glomar response with respect to the existence or non-existence of other FISA

surveillance targets is proper under FOIA Exemption 1, which protects from disclosure records

that are "(A) specifically authorized under criteria established by an Executive order to be kept

secret in the interest of national defense or foreign policy and (B) are in fact properly classified

pursuant to such Executive order."  5 U.S.C. § 552(b)(1).  The current standard for classification

is set forth in Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009), which allows an agency

to "withhold information that (1) 'pertains to' one of the categories of information specified in the Executive order, including . . . 'intelligence sources and methods,' . . . and (2) if 'unauthorized disclosure of the information could reasonably be expected to cause identifiable and describable damage to the national security.'" *N.Y. Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 104 (2d Cir. 2014) (quoting Exec. Order 13526 §§ 1.1, 1.4), *amended on denial of reh'g*, 758 F.3d 436 (2d Cir. 2014); *see also Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983) (FOIA "bars the courts from prying loose from the government even the smallest bit of information that is properly classified or would disclose intelligence sources or methods."). A Glomar response is expressly contemplated by Executive Order 13526 whenever the fact of the existence or non-existence of requested records "is itself classified under this order or its predecessors." Exec. Order 13526 § 3.6(a); *see also Wilner*, 592 F.3d at 67-68 (Glomar response is proper if the fact of the existence or non-existence of agency records falls within a FOIA exemption).

NSD has logically and plausibly explained why it cannot confirm or deny the existence of additional responsive records that would identify other FISA targets, if any, without revealing information that is currently and properly classified and exempt from disclosure under FOIA Exemption 1.[5]  First, the existence or non-existence of additional responsive records "pertains to" one of the categories of information protected by Executive Order 13526, namely, "intelligence sources and methods."  Second, NSD has determined that disclosure of the existence or non-existence of additional responsive records could reasonably be expected to

_____

[5] The Findlay Declaration supplements and expressly adopts two NSD declarations filed previously in this litigation by G. Bradley Weinsheimer.  Findlay Decl. ¶ 3 & Exs. 1-2.  As set forth in the Findlay Declaration, "[a]ll of the reasons for the Glomar response set forth in the Original [Weinsheimer] Declaration, including the potential harms to national security that would result from the release of any information, remain applicable."  Findlay Decl. ¶ 9.

cause identifiable damage to national security by revealing to adversaries which individuals and/or organizations have or have not been subjects of FISA-authorized surveillance, and thereby potentially enabling those adversaries to impair United States intelligence investigations and/or carry out their own intelligence activities.

NSD's Glomar response is intended to safeguard currently and properly classified information pertaining to intelligence sources and methods, which are protected by Section 1.4(c) of Executive Order 13526.  *See* Findlay Decl. ¶ 9 & Ex. 1 ¶¶ 10-17.  Absent highly unusual circumstances, NSD generally does not confirm or deny the existence of records regarding any particular individual alleged to be pertinent to operational FISA work.  Findlay Decl. ¶ 9 & Ex. 1 ¶ 11.  Aside from the specific, limited acknowledgements regarding the non-existence of records of alleged wiretapping of then-candidate Trump in Trump Tower by the Obama Administration prior to the 2016 election, and the existence of FISC applications and orders to conduct surveillance of Carter Page, there have been no official acknowledgments of any other records responsive to Plaintiff's FOIA request.  Findlay Decl. ¶ 9.  Disclosing whether or not NSD possessed responsive records would divulge the existence or non-existence of FISA records related to particular intelligence targets.  *See* Findlay Decl. ¶ 9 & Ex. 1 ¶ 12.

Pursuant to DOJ's operative security classification guide, the fact that a FISA application was submitted or used in a particular case is classified national security information, as is identification of specific individuals or organizations who are subjects of a national security investigation making use of a FISA warrant.  *See* Findlay Decl. ¶ 9 & Ex. 1 ¶ 11.  To disclose the existence or non-existence of responsive documents in NSD files would disclose whether or not particular individuals or organizations were pertinent to FISA applications and orders, thus disclosing information pertaining to intelligence sources and methods under Executive Order

13526 § 1.4(c).  *See* Findlay Decl. ¶ 9 & Ex. 1 ¶ 12.  Surveillance authorized by the FISC under

any of its authorities is itself an intelligence method, and its use in any particular matter thus

"pertains to" an intelligence source or method.  *Cf. Clapper v. Amnesty Int'l USA,* 568 U.S. 398

(2013) (describing FISA authorities).

Confirming whether or not NSD possessed responsive records reasonably could be

expected to cause damage to the national security of the United States by disclosing the existence

or non-existence of intelligence sources and methods.  *See* Findlay Decl. ¶ 9 & Ex. 1 ¶¶ 12-13.

Such disclosure would permit hostile intelligence services to use FOIA to acquire information

about United States intelligence investigations.  *See* Findlay Decl. ¶ 9 & Ex. 1 ¶ 13.  Once a

particular source or method, or the fact of its use in a particular situation, is discovered, its

continued usefulness may be degraded.  *Id.*

Moreover, information disclosed in response to FOIA requests becomes public, and

intelligence organizations and other adversaries are expert at acquiring and analyzing

information in the public domain.  *See* Findlay Decl. ¶ 9 & Ex. 1 ¶ 14.  If NSD were to indicate

that it maintains responsive information, trained intelligence analysts would have additional

pieces of information that could be compiled into a catalogue of FISA-authorized activities.  *Id.*

Among other things, this information could be used to deploy counterintelligence assets against

the United States government and impair United States intelligence collection.  *Id.*  Conversely,

revealing an absence of responsive records pertaining to particular individuals or organizations

would tend to indicate that persons within the scope of the request were not pertinent to the

approval of FISA applications.  *See* Findlay Decl. ¶ 9 & Ex. 1 ¶ 15.  That fact could be extremely

valuable to foreign powers and hostile intelligence services, who could use it to carry out

intelligence activities with the knowledge that the United States government is not monitoring certain people and may not even suspect them.  *Id.*

Accordingly, the best way for NSD to protect critical intelligence information and minimize the harm to national security is to assert a Glomar response to requests for information pertaining to operational FISA work.  *See* Findlay Decl. ¶ 9 & Ex. 1 ¶ 16.  To be credible and effective, NSD must use the Glomar response consistently in all cases where the existence or non-existence of records responsive to a FOIA request is a classified fact, as it is here, including instances in which NSD does not possess records responsive to a particular request.  *Id.*  If NSD were to invoke a Glomar response only when it actually possessed responsive records, the Glomar response would be interpreted as an admission that responsive records exist, and would thereby reveal the very information that NSD is seeking to protect in the interest of national security.  *Id.*  An admission of the fact that NSD was in possession of particular records relating to specific FISA-authorized surveillance targets would provide hostile foreign powers with operationally valuable information about hypothetical United States intelligence investigations and allow those powers to subvert those same hypothetical investigations.  *See id.*  Similarly, if NSD were to make clear to the public via a response to a FOIA request that it did not possess responsive records relating to specific FISA-authorized surveillance targets, hostile foreign powers could use that fact to carry out activities against the United States with the knowledge the government is not surveilling certain people.  *See id.*

The government thus routinely provides a Glomar response to requests for information about particular surveillance subjects, and courts routinely uphold such responses.  *See, e.g., Platsky v. NSA*, No. 11 Civ. 4816 (SLT) (RLM), 2013 U.S. Dist. LEXIS 190947, *1-2 (E.D.N.Y. Jan. 30, 2013) (NSA and CIA Glomar responses pursuant to FOIA Exemptions 1 and 3, and FBI

Glomar response pursuant to FOIA Exemption 7(E), were proper responses to FOIA request

seeking "materials concerning covert operations" involving plaintiff), *aff'd* 547 F. App'x 81, 82

(2d Cir. 2013) (summary order); *Roman v. NSA*, No. 07 Civ. 4502 (JFB) (WDW), 2009 U.S.

Dist. LEXIS 9147, *22-24 (E.D.N.Y. Feb. 9, 2009) (NSA Glomar response pursuant to FOIA

Exemptions 1 and 3 was proper response to FOIA request seeking satellite surveillance records),

*aff'd*, 354 F. App'x 591 (2d Cir. 2009) (summary order); *Marrera v. U.S. Dep't of Justice*, 622 F.

Supp. 51, 53–54 (D.D.C. 1985) ("[T]his Court finds that [DOJ's] refusal to confirm or deny the

existence of FISA records pertaining to this particular plaintiff to be justified in the interests of

national security as part of an overall policy of [the Executive Order] with respect to all FISA

FOIA requests."); *Schwarz v. U.S. Dep't of Treasury*, 131 F. Supp. 2d 142, 149 (D.D.C. 2000)

("[DOJ] properly refused to confirm or deny that it had any responsive records maintained under

[FISA] and in non-FISA files relating to various intelligence techniques."), *aff'd*, No. 00-5453,

2001 U.S. App. LEXIS 13882 (D.C. Cir. May 10, 2001) (per curiam); *Wilner*, 592 F.3d at 70, 73

(upholding, pursuant to FOIA Exemption 3, NSA's Glomar response regarding whether

"particular persons were targeted or subject to surveillance").

Indeed, the July 2018 release of FISA applications and orders to conduct surveillance of

Page was unprecedented:  prior to that release, there had never been any public disclosure of an

application to the FISC or an order from the FISC pertaining to a specific individual surveillance

target.  Findlay Decl. ¶ 7.  Nothing about the Page release—which was necessitated by the highly

unusual circumstances of the specific February 2018 declassification and disclosures regarding

Page—alters DOJ's longstanding justifications for invoking the Glomar response for requests for

information regarding particular surveillance targets.  *See generally* Findlay Decl. ¶ 3 & Ex. 1

¶¶ 10-16.  The Department's explanations for providing the Glomar response to the Request

pursuant to FOIA Exemption 1 are eminently logical and plausible, especially given that NSD's predictive judgments regarding the potential harm to national security of disclosure are entitled to "substantial weight" from the Court.  *Wilner*, 592 F.3d at 73, 76; *ACLU*, 681 F.3d at 70-71.

### III.    DOJ Has Not Officially Acknowledged the Existence or Non-Existence of Additional Responsive Records

Other than (a) DOJ's 2017 acknowledgement that it has no records of alleged wiretapping of then-candidate Trump in Trump Tower by the Obama Administration prior to the election, as referenced in the President's March 4, 2017 tweets, and (b) the extraordinary public acknowledgements and FOIA releases concerning FISC applications and orders to conduct surveillance of Carter Page, the Executive Branch has not publicly or officially confirmed or denied the existence of any records responsive to Plaintiff's FOIA request.  Findlay Decl. ¶ 9.

### A.    Legal Standard for Official Acknowledgement

"An agency only loses its ability to provide a Glomar response when the existence or nonexistence of the particular records covered by the Glomar response has been officially and publicly disclosed."  *Wilner*, 592 F.3d at 70.  The Second Circuit applies "[a] strict test" to claims of official disclosure:  "classified information that a party seeks to obtain . . . is deemed to have been officially disclosed only if it (1) '[is] as specific as the information previously released,' (2) 'match[es] the information previously disclosed,' and (3) was 'made public through an official and documented disclosure.'"  *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009) (quoting *Wolf*, 473 F.3d at 378); *see N.Y. Times*, 756 F.3d at 120 & n.19 (applying *Wilson* test and affirming that *Wilson* "remains the law of this Circuit"); *N.Y. Times Co. v. CIA*, 314 F. Supp. 3d 519, 528 (S.D.N.Y. 2018) (applying *Wilson* to analyze Glomar response by CIA), *appeal docketed*, No. 18-2112 (2d Cir. July 18, 2018).

With respect to the first *Wilson* requirement, "[p]rior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure."  *Wolf*, 473 F.3d at 378 (emphasis in original); *Hudson River Sloop Clearwater, Inc. v. Dep't of Navy*, 891 F.2d 414, 421 (2d Cir. 1989) (courts may not find official acknowledgment unless "the government has *officially* disclosed the *specific* information being sought" (emphases in original)).  The specificity requirement "recognizes 'the Government's vital interest in information relating to national security and foreign affairs.'" *Wolf*, 473 F.3d at 378 (quoting *Pub. Citizen v. Dep't of State*, 11 F.3d 198, 203 (D.C. Cir. 1993)). The information already released must be of the same level of specificity as the information sought—broadly crafted disclosures, even on the same general topic, do not waive the Glomar response.  *See, e.g.*, *Wilner*, 592 F.3d at 69-70 (government's public acknowledgment of the existence and purpose of a clandestine intelligence program did not preclude a Glomar response to a request for specific surveillance methods used, the targets of surveillance, and information obtained); *Amnesty Int'l USA v. CIA*, 728 F. Supp. 2d 479, 512 (S.D.N.Y. 2010) ("A general acknowledgment . . . is not equivalent to 'specific information sought.'" (quoting *Wolf*, 473 F.3d at 378)).

The "matching" requirement of *Wilson* demands that there be no "substantive differences" between the information requested and the information previously disclosed. *ACLU*, 628 F.3d at 621.  In *New York Times*, the Second Circuit explained that it did not "understand the 'matching' aspect of the *Wilson* test to require absolute identity," but it nevertheless required a high degree of overlap between the information previously disclosed and the information the agency sought to protect.  756 F.3d at 116, 120.  Specifically, in finding that the government had officially acknowledged certain legal analysis in a memorandum prepared

by DOJ's Office of Legal Counsel ("OLC") about a contemplated lethal operation, the court

concluded that the legal analysis in the OLC memorandum "virtually parallel[ed]" legal analysis

that DOJ had previously released in a white paper on the same topic.  *Id.* at 116.  Indeed, without

a high degree of overlap between two pieces of information, courts could not assess whether the

protected information was "as specific as the information previously disclosed."  *Id.* at 120; *see*

*Hudson River Sloop Clearwater*, 891 F.2d at 421; *N.Y. Times*, 314 F. Supp. 3d at 529-30 (finding

that a tweet by President Trump and subsequent statements by President Trump to a media outlet

did not satisfy the specificity and matching requirements necessary to constitute an official

acknowledgement).

> The specificity and matching requirements of the *Wilson* test are equally applicable in the

context of a Glomar response.  *See Wilner*, 592 F.3d at 70 (agency only "precluded from making

a Glomar response if the existence or nonexistence of the *specific records* sought by the FOIA

request has been the subject of an official public acknowledgement" (emphasis added) (internal

quotation marks omitted)); *N.Y. Times*, 314 F. Supp. 3d at 528-30.  "In the Glomar context, the

specific information at issue is not the contents of a particular record, but rather the existence *vel*

*non* of any records responsive to the FOIA request."  *ACLU v. CIA*, 710 F.3d 422, 427 (D.C. Cir.

2013) (internal quotation marks omitted).

> The third *Wilson* requirement of an official and authorized disclosure recognizes that

there is a "critical difference between official and unofficial disclosures" of classified

information.  *Wilson*, 586 F.3d at 186.  "[T]he law will not infer official disclosure" of classified

information from "(1) widespread public discussion of a classified matter, . . . (2) statements

made by a person not authorized to speak for the Agency, . . . or (3) release of information by

another agency, or even by Congress."  *Id.* (internal citations omitted).  And it is clear that a

reporter's speculation, or unattributed statements by unknown government officials, cannot constitute official disclosure.  *See, e.g., id.*; *ACLU*, 628 F.3d at 621-22.

### B.     There Has Been No Official Acknowledgement of the Existence or Non-Existence of Additional Records Responsive to the FOIA Request

The Request seeks classified information about whether other individuals or entities were or were not subject to FISA-authorized surveillance in 2016.  But unlike the Majority Memo—which provides a clear example of a disclosure of specific information, namely the existence of FISA applications and orders to conduct surveillance of Carter Page—no statements by President Trump or any other authorized official, individually or in combination, satisfy the elements for an official disclosure of the existence or non-existence of records submitted to or received from the FISC regarding any other purported surveillance targets.

The Majority Memo specifically disclosed the existence of FISA applications and orders regarding Page.  On the first page of the document, the Majority Memo states: (i) "On October 21, 2016, DOJ and FBI sought and received a FISA probable cause order (not under Title VII) authorizing electronic surveillance on Carter Page from the FISC" (emphasis in original); and (ii) "The FBI and DOJ obtained one initial FISA warrant targeting Carter Page and three FISA renewals from the FISC."  *See* Dkt. No. 39-2 at 1.  The Majority Memo also includes additional details about the Page FISA applications, including the names of the senior DOJ and FBI officials who signed the applications.  *Id.* at 1.  Shortly after President Trump authorized the declassification of the Majority Memo on February 2, 2018, DOJ modified its Glomar response. *See* Dkt. No. 40 ("Accordingly, [DOJ] withdraws the Glomar response as to the existence of the Page FISA applications and orders identified in the [Majority Memo].").

In contrast, none of the alleged official disclosures referenced by Plaintiff in its pleadings or other filings in this action specifically reveals the existence or non-existence of any additional records responsive to the FOIA request.

First, contrary to the premise of the complaint, President Trump's Twitter post on March 4, 2017, does not acknowledge the existence or non-existence of additional responsive records. The only purported surveillance target *specifically* referenced in the March 4 tweets is then-candidate Trump. *See supra* at 4 ("Obama had *my* 'wires tapped' in Trump Tower; "President Obama was tapping *my* phones"; "How low has President Obama gone to tapp [*sic*] *my* phones") (emphases added). The only purported surveillance location specifically referenced in the March 4 tweets is Trump Tower. *See id.* And the only time period referenced in connection with the purported surveillance was October 2016, immediately prior to the presidential election. *See id.* ("my 'wires tapped' in Trump Tower *just before the victory*"; "Is it legal for a sitting President to be 'wire tapping' a race for president *prior to an election*?; "President Obama was tapping my phones *in October, just prior to Election*"; "…tapp [*sic*] my phones *during the very sacred election process*") (emphases added). The statements in the March 4, 2017 Twitter post are limited to a particular target, a particular place, and a particular time. Thus, when then-Director Comey testified about the tweets on March 20, 2017, he addressed the specific assertions by the President "about alleged wiretapping directed at him by the prior administration," and confirmed that no records existed at the FBI or DOJ to support the tweets. *See* Findlay Decl. ¶ 3 & Ex. 1 ¶ 6. This constituted a specific official acknowledgement of the non-existence of a particular subset of records sought by Plaintiff in the Request.

The March 4, 2017 tweets cannot plausibly be read, as Plaintiff has argued, as confirmation of the existence of specific FISA-authorized warrants from June and October 2016.

*See* Dkt. No. 31 at 5.  The tweets made no specific reference to FISA or the FISC, let alone to operations carried out against specific surveillance targets.  Indeed, President Trump's subsequent comments regarding the tweets (in materials previously proffered by Plaintiff) indicate that even the particular words used in the tweets to describe the purported surveillance activities are ambiguous and subject to multiple interpretations.  *See* Dkt. No. 32-4 (Carlson/Trump interview tr.) at 18 ("And don't forget, when I say, wiretapped, those words were in quotes, that really covers because wiretapping is pretty old-fashioned stuff but that really covers surveillance and many other things.  And nobody ever talks about the fact that was in quotes but that's a very important thing.  Wiretaps covers a lot of different things.").  Moreover, the materials previously cited by Plaintiff reveal that the President sent the March 4, 2017 tweets in response to a television news report and an earlier *New York Times* article, *see* Dkt. No. 32-4 at 16, which in and of itself casts doubt on whether the statements can be official disclosures. *See N.Y. Times*, 314 F. Supp. 3d at 529 (upholding CIA Glomar response where (i) there was "no suggestion that President Trump's tweet and statements . . . were sourced directly from the records requested by [the plaintiff]" and (ii) there was ambiguity as to whether the President was referring to a specific classified program or instead to a media outlet's characterization of the program).

Plaintiff has also proffered remarks by former Press Secretary Sean Spicer that refer to news media reports regarding alleged surveillance activities.  *See* Dkt. No. 31 at 16-17.  But these statements contain no specific official acknowledgement as to the existence or non-existence of FISA applications or orders regarding particular surveillance targets.  In describing and quoting various news reports about alleged surveillance, Mr. Spicer merely stated that there had been considerable media coverage of the purported surveillance activities—at no point did

21

he confirm the existence or non-existence of any records or any specific surveillance actions. *See* Dkt. No. 32-2 at 21-24, 28 ("These are merely pointing out that I think there is widespread reporting that throughout the 2016 election there was surveillance that was done on a variety of people that came up."), 31 ("what I think is clear though is—through the reporting that I just read—is that there's clearly widespread open-source material pointing to surveillance that was conducted during the 2016 election"). There is no dispute that media reports quoting unnamed and unofficial sources do not constitute official disclosure. *See Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990) ("'[I]t is one thing for a reporter or author to speculate or guess that a thing may be so or even, quoting undisclosed sources, to say that it is so; it is quite another thing for one in a position to know of it officially to say that it is so.'"); *Wilson*, 586 F.3d at 186 ("the law will not infer official disclosure" or classified information from "widespread public discussion of a classified matter"). Nor does mere comment on or recitation of media reports, or even apparent reliance on them, in the absence of any express and specific statement acknowledging the existence or non-existence of particular classified records.

Later tweets and public statements by President Trump likewise do not reveal specific information regarding the existence or non-existence of additional responsive records. In a January 11, 2018, President Trump wrote, "'House votes on controversial FISA ACT today.' This is the act that may have been used, with the help of the discredited and phony Dossier, to so badly surveil and abuse the Trump Campaign by the previous administration and others?" *Available at* www.twitter.com/realDonaldTrump (last visited Sept. 13, 2018). While this statement broadly addresses the possibility of FISA-authorized surveillance of the "Trump Campaign," the tweet is not an official acknowledgement of the specific information withheld in this case. It indicates only that FISA "may have been used" to conduct surveillance of the

campaign, with the assertion even ending in a question mark. Unlike the specific references to FISC-authorized surveillance in the Majority Memo, this tweet is subject to multiple possible interpretations, and does not satisfy the *Wilson* requirements.

Similarly, two other statements regarding "surveillance" have recently been attributed to President Trump: (i) an August 24, 2018 tweet that mentions, among other things, "illegal surveillance of Trump Campaign," *available at* www.twitter.com/realDonaldTrump (last visited Sept. 13, 2018); and (ii) during an interview with the *Daily Caller*, "[w]hen asked whether he would declassify documents relating to a FISA warrant obtained on Carter Page," President Trump is quoted as saying, "I mean, they were surveilling my campaign," *available* at https://dailycaller.com/2018/09/05/trump-obama-declassification (last visited Sept. 13, 2018). Yet again, neither of these assertions provides specific information about any particular purported surveillance targets that are the subjects of the remainder of the Request. Moreover, both statements could be read as references to the FISC-authorized surveillance of Page—the August 24, 2018 tweet was issued just three days after the Page FISA applications and orders were made public, and the *Daily Caller* statement was made in the specific context of a question about the FISA applications and orders regarding Page.

At bottom, none of the statements identified by Plaintiff confirms whether or not any additional FISA applications or orders exist with regard to other persons or entities. Because that information remains properly classified, the Court should sustain the Department's Glomar response to the remainder of the FOIA request.

**CONCLUSION**

For the foregoing reasons, DOJ's motion for summary judgment should be granted.

Dated:    New York, New York
          September 14, 2018

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
*Attorney for Defendant Department of Justice*

By:    */s/ Andrew E. Krause*
       _____
       ANDREW E. KRAUSE
       Assistant United States Attorney
       86 Chambers Street, Third Floor
       New York, New York  10007
       Telephone:  (212) 637-2769